WALLACE, Judge.
Upon consideration of the “Motion for Rehearing, Motion for Rehearing- En Banc, and Motion for Certification” filed by Appellee on May 30, 2012,
IT IS ORDERED that the request for rehearing is granted. Accordingly, the opinion dated May 16, 2012, is withdrawn, and the attached opinion is substituted therefor.
The revised opinion — which does not affect the disposition of the case — reflects that the court considered and rejected the Appellee’s assertion of long-arm jurisdiction over the Appellants under section 48.193(2), Florida Statutes (2010), as well as section 48.193(l)(a).
The Appellee’s requests for rehearing en banc and for certification are denied. No further motions for rehearing will be entertained.
The Appellants, Harris Schwartzberg, Maxwell Stolzberg, and multiple trusts are among the defendants in nursing home litigation brought by the Appellee, Kim K. Knobloch, as the personal representative of the Estate of William Knobloch, de *176 ceased. The Appellants challenge the circuit court’s order denying their motions to dismiss for lack of personal jurisdiction.[1] Because Ms. Knobloch failed to establish any basis for personal jurisdiction of the Appellants in Florida, we reverse the circuit court’s order.
I. INTRODUCTION
William J. Knobloch was a resident of a 185-bed skilled nursing facility known as “Palm Terrace of Lakeland,” from January 24, 2004, until his discharge on January 1, 2010. In June 2010, Mr. Knobloch filed an action against the operator of the nursing home and others for alleged deficiencies in his care during his residence at the home. Mr. Knobloch alleged claims for negligence, breach of fiduciary duty, and violations of section 415.1111, Florida Statutes (2009). Mr. Knobloch died on October 17, 2010. Ms. Knobloch was appointed as the personal representative of his estate, and she was substituted as the plaintiff in the pending litigation.
In March 2011, Ms. Knobloch filed a second amended complaint that named the Appellants as defendants along with numerous other entities and individuals. Two of the Appellants, Harris Schwartz-berg and Maxwell Stolzberg, are individuals who reside in the State of New York. The remaining Appellants are twenty trusts created and registered in the State of New York (the New York trusts). Mr. Schwartzberg, Mr. Stolzberg, and the New York trusts each filed a motion to dismiss the second amended complaint against them for lack of personal jurisdiction. The question we are called upon to decide is whether the Appellants — all of whom are nonresidents of Florida — had sufficient contacts with the subject of the litigation or the State of Florida to warrant Florida’s exercise of personal jurisdiction over them.
II. THE FACTS
During the period of Mr. Knobloch’s residence at Palm Terrace of Lakeland, a group of related companies known as “the Schwartzberg Companies” had an interest in that nursing home and in sixteen other facilities in Florida. The Schwartzberg Companies structured the ownership and operation of these facilities in a complex web of limited liability companies, corporations, and trusts. We offer the following explanation of the relationship between the various Appellants and Palm Terrace of Lakeland.
Each of the seventeen facilities was operated by a separate entity. SA-Lake-land, LLC, held the license for and operated the nursing home known as “Palm Terrace of Lakeland.” At the first tier of ownership, SA-Lakeland, LLC, had two parent companies. CHC-CLP Operator Holdings, LLC, owned a 99.5% interest in the subsidiary operating company; CHC-SPC Operator, Inc., owned the remaining .5% interest. Also at the first level, CHC-CLP Operator Holdings, LLC, owned 100% of CHC-SPC Operator, Inc.
At the second tier of ownership, SA-Master Operator Holdings, LLC, owned 99.5% of CHC-CLP Operator Holdings, LLC. Several of the New York trusts apparently owned the remaining .5%. Before a restructuring that occurred in August 2007, the ownership of CHC-CLP Operator Holdings, LLC, was divided equally among Mr. Schwartzberg and three of the New York trusts.
At the third tier, sixteen of the New York trusts owned SA-Master Operator Holdings, LLC. Thus all of the New York trusts apparently had an indirect interest *177 in SA-Lakeland, LLC, the operator of the nursing home, either through their ownership interest in its grandparent company, SA-PG Master Operator Holdings, LLC, or through their ownership interest in one of the parent companies, CHC-CLP Operator Holdings, LLC.[2]
A separate entity managed the nursing home. Cypress Health Care Management Region III, LLC, acted as the management company for Palm Terrace of Lake-land. Cypress Health Care Holdings, LLC, owned 95% of the management company. Four of the New York trusts — HS National Trust # 1, JS National Trust, HS National Trust #2, and Fam National Trust — had ownership interests in the management company and its parent. In addition to the management company, several other related entities furnished goods and services to the nursing home.
As previously noted, Mr. Schwartzberg owned a 25% interest in CHC-CLP Operator Holdings, LLC, the nursing home’s parent company, until August 2007, when a restructuring occurred. Based on our limited record, it is impossible to state exactly the involvement of Mr. Schwartzberg and Mr. Stolzberg in this complex web of companies. However, both Mr. Schwartzberg and Mr. Stolzberg admittedly owned, either directly or indirectly, interests in several of the entities involved. They certainly had an indirect ownership interest in SA-Lakeland, LLC, the operating company for the nursing home. In addition, they seem to have served as managers of some of the limited liability companies.
III. THE COMPLAINT AND THE AFFIDAVITS
In her second amended complaint, Ms. Knobloeh alleged that each of the Appellants had conducted and engaged in business activities within the State of Florida; engaged in substantial and not isolated activities within the State of Florida; and purposely [took advantage] of the privileges of the State of Florida, through ... ownership of, leasing of, operation of, management of, and/or consultation with nursing homes, including PALM TERRACE OF LAKE-LAND, within the State of Florida.
Based on such allegations, Ms. Knobloeh asserted that each of the Appellants was subject to the jurisdiction of the Florida courts in accordance with section 48.193(l)(a), (2), Florida Statutes (2010).
Section 48.193(l)(a) provides that any person, whether or not a citizen of Florida, is subject to the jurisdiction of this state’s courts for any action arising out of “[operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state.” Thus jurisdiction may be asserted upon nonresident persons or entities in accordance with the statute where the cause of action arises from that person’s business activities in Florida, i.e., where “connexity” exists. See White v. Pepsico, Inc., 568 So.2d 886, 889 n. 4 (Fla.1990) (“ ‘Connexity’ is the term courts have adopted to mean a link between a cause of action and the activities of a defendant in the forum state.”).
If there is a basis for jurisdiction under section 48.193(1), the plaintiff must still establish that the nonresident defendant has sufficient minimum contacts with the State of Florida to satisfy due process of law. See Int’l Shoe Co. v. State of Wash., Office of Unemployment Comp. & *178 Placement, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). The test is whether “the defendant’s conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.” World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).
Section 48.193(2) provides that “[a] defendant who is engaged in substantial and not isolated activity within this state, whether such activity is wholly interstate, intrastate, or otherwise, is subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity.” Section 48.193(2) “does not require connexity between a defendant’s activities and the cause of action.” Camp Illahee Investors, Inc. v. Blackman, 870 So.2d 80, 85 (Fla. 2d DCA 2003) (quoting Woods v. Nova Cos. Belize Ltd., 739 So.2d 617, 620 (Fla. 4th DCA 1999)). And, “if the defendant’s activities meet the requirements of this section, the due process requirement of minimum contacts is fulfilled.” Id.
In this case, Mr. Schwartzberg and Mr. Stolzberg are residents of the State of New York. Ms. Knobloch does not contend that any of the trustees of the New York trusts are residents of the State of Florida. In her second amended complaint, Ms. Knobloch alleged that each of the trusts “is a New York entity.” We interpret this allegation as an acknowledgment that the situs of the trusts is in New York. Cf. Lampe v. Hoyne, 652 So.2d 424, 426 (Fla. 2d DCA 1995) (holding that the plaintiff had not established a basis for jurisdiction in Florida over a nonresident trustee where it was not established that the situs of the trust was in Florida); Miller v. Braunstein, 549 So.2d 797, 797-98 (Fla. 5th DCA 1989) (same). Thus the Appellants have little, if any, connection with Florida other than their indirect interests in the nursing home’s operating company and the interest of some of the New York trusts in the management company. That said, the Appellants agree that Ms. Knob-loch pleaded a basis under section 48.193 for service of process on the Appellants in New York.
However, the Appellants contested the asserted basis for jurisdiction by supporting their motions to dismiss with affidavits asserting that they did not have the requisite contacts with Florida. “A defendant wishing to contest the allegations of the complaint concerning jurisdiction or to raise a contention of minimum contacts must file affidavits in support of his position. The burden is then placed upon the plaintiff to prove by affidavit the basis upon which jurisdiction may be obtained.” Venetian Salami Co. v. Parthenais, 554 So.2d 499, 502 (Fla.1989). If the affidavits can be harmonized, the court can resolve the jurisdiction issue based upon the undisputed facts. Id. at 502-03. If not, “the trial court [must] hold a limited evidentia-ry hearing in order to determine the jurisdiction issue.” Id. at 503. The trial “court’s decision must resolve (1) whether there are sufficient jurisdictional facts to bring the action within the long-arm statute, and (2) whether the nonresident defendant has sufficient minimum contacts with Florida to satisfy due process requirements.” Greystone Tribeca Acquisition, L.L.C. v. Ronstrom, 863 So.2d 473, 475 (Fla. 2d DCA 2004)- (citing Venetian Salami, 554 So.2d 499 and Kin Yong Lung Indus. Co. v. Temple, 816 So.2d 663 (Fla. 2d DCA 2002)).
The Appellants’ affidavits state generally that they did not have any offices in Florida; did not employ anyone in Florida; and did not control, operate, manage, consult with, or supervise the activities of Palm Terrace of Lakeland. In response, Ms. Knobloch filed an opposing affidavit *179 prepared by Victoria Fierro, a Certified Public Accountant. Ms. Fierro did not base her affidavit on any direct knowledge of Palm Terrace of Lakeland and the Appellants. Instead, she relied for her information on various public records, including the nursing home’s application for licen-sure, “controlling interest” affidavits, and cost reports.
In her affidavit, Ms. Fierro notes that in 2007 the Schwartzberg Companies sent a letter to the Agency for Health Care Administration (AHCA) stating, “[a]s you know, our companies operate 17 facilities in Florida under the ‘Palm Garden’ and ‘Palm Terrace’ trade names.” Attached to that letter are several pages containing diagrams of the companies’ labyrinthine organizational structure.[3] Based on the letter and the diagrams, Ms. Fierro opined that the New York Trusts “are the upstream 5% or greater controlling interests for the nursing home group that includes Palm Terrace of Lakeland.”
Ms. Fierro also noted that Mr. Schwartzberg was listed in a “2008 Medicaid Cost Report for Palm Terrace of Lake-land as a 45% owner of SA-Lakeland, LLC,” the operating company for the nursing home, and as “a 25% owner of Cypress Administrative Services, LLC.” Ms. Fierro described Cypress Administrative Services, LLC, as “a related party providing services to the nursing home with allowable costs in excess of $8,468,686.” She attached a copy of the nursing home cost report to her affidavit.
In addition, Ms. Fierro attached a copy of a document filed with the Florida Secretary of State indicating that Mr. Schwartz-berg is a member-manager of Medstar Consulting, LLC, a Delaware limited liability company authorized to transact business in Florida. She also noted that Mr. Schwartzberg had signed a $15,780 check to AHCA for the lease bond for another facility. Furthermore, Ms. Fierro reported that Mr. Schwartzberg is listed on a controlling interest affidavit submitted to AHCA in 2007 as having a 5% or greater interest in SA-Lakeland, LLC, the nursing home’s operating company. Based on other available information, it appears that the information concerning Mr. Schwartz-berg’s interest in the operating company refers to indirect rather than direct ownership.
With regard to Mr. Stolzberg, Ms. Fier-ro noted that he was listed in the 2008 cost report for Palm Terrace of Lakeland as the sole member and manager of SA-Lakeland, LLC, the operating company. This information appears to conflict with other available information and Mr. Schwartzberg’s reported 45% interest in the operating company. Ms. Fierro did not address this apparent inconsistency, and we are unable to resolve it.
Finally, Ms. Fierro attached to her affidavit a newspaper article that discussed the trend toward increasing complexity in the ownership structure of nursing homes, including the use of multilayered, single-purpose entities such as the ones involved in this case. Ms. Fierro explained that because of Congressional hearings and reports by the Government Accounting Office, Congress amended the Social Security Act to require more transparency in the reporting requirements for nursing homes. She attached a copy of the revised Social Security Act, Section 1124 (42 U.S.C. § 1320-3). The Appellants moved to strike this part of the affidavit and these *180 materials as hearsay, but the circuit court did not rule on their motion.
IV. THE CIRCUIT COURT’S RULING
At the hearing on the Appellants’ motions to dismiss, the parties did not offer any additional evidence and their presentations were limited to the arguments of counsel. The circuit court inquired of Appellants’ counsel whether the ownership of the seventeen Florida facilities had been structured to enable various nonresident individuals and entities to maintain operational and budgetary control over the facilities, to direct profits from the facilities upstream, but to avoid liability and financial responsibility for the consequences of their operations. The circuit court suggested that such circumstances might give rise to personal jurisdiction over the Appellants in Florida, and, ultimately, it denied the Appellants’ motions to dismiss. This appeal followed.
V. STANDARD OF REVIEW
 This court’s standard of review on orders finding personal jurisdiction over a nonresident defendant is de novo. Camp Illahee Investors, Inc. v. Blackman, 870 So.2d 80, 83 (Fla. 2d DCA 2003). In addition, Florida’s long arm statute must be strictly construed. Id.
VI.DISCUSSION
After a thorough review of the record in this case, especially the affidavits filed by the parties, we reverse the circuit court’s ruling denying the Appellants’ motion to dismiss. However, we acknowledge that the experienced circuit judge displayed an astute grasp of current trends in the ownership structures of nursing homes and similar facilities. The era of the locally owned, “mom and pop” nursing facility is gone. Increasingly, private investment groups own large chains of nursing homes. Charles Duhigg, At Many Homes, More Profit and Less Nursing, N.Y. Times, Sept. 23, 2007, http://www.nytimes.com/ 2007/09/23/business/23nursing.html. With the end of the locally owned nursing home, it has become common for nursing facilities to have complex ownership and management structures such as the one in this case. See, e.g., Lefkovitz v. Wagner, 291 F.Supp.2d 764, 767 (N.D.Ill.2003) (describing an ownership and management structure involving a number of levels), ajfd, 395 F.3d 773 (7th Cir.2005); Salley v. Heartlandr-Charleston of Hanahan, SC, LLC, 2010 WL 5136211 (D.S.C.2010) (addressing the question of personal jurisdiction of a sixth-tier parent company to the facility where the plaintiffs’ decedent was a resident); House v. 22 Tex. Servs., Inc., 60 F.Supp.2d 602 (S.D.Tex.1999) (describing a complex ownership and management structure established by a group that owned forty-nine nursing homes and assisted living facilities in Texas). These complex structures arise because the owners of multiple nursing homes and similar facilities have adopted the use of the single purpose entity (SPE) to minimize the various risks of their businesses.
In an instructive and informative article, two health care lawyers suggest that owners of nursing homes and similar facilities consider the use of SPEs for their ownership and operations to minimize business risk. Joseph E. Casson & Julia McMillen, Protecting Nursing Home Companies: Limiting Liability Through Corporate Restructuring, 36 J. Health L. 577 (Fall 2003). The authors provide several examples of this strategy:
[AJcompany could decide to restructure down to the individual facility level by forming real property SPEs to own each piece of real estate that is used as a nursing home, and by forming a corre *181 sponding number of operating SPEs to lease and operate the nursing homes. Alternatively, a company could decide to subdivide its operations into subsidiaries that own and operate only a certain number of facilities each, based upon the level of risk the company is willing to accept. In addition, a company could elect to place all of its real estate in a real property SPE, but operate each facility through an operating SPE. In effect, any restructuring should be customized to the particularized needs of each company.
Id. at 579. According to the authors, the benefits of employing these strategies include containing exposure to risk to the facility involved, thereby avoiding the exposure of all of the facilities in the group to liability. Id. The risks to be minimized by these strategies include: (1) exclusion from the Medicare and Medicaid programs, (2) Medicare and Medicaid overpayment liability, (3) liability under the federal False Claims Act, and (4) liability for damages to residents in tort or under other theories. Id. at 580-85. Where these strategies are employed, the operating company may have minimal assets. If the operating company is effectively judgment-proof, an injured resident may find it difficult, if not impossible, to collect on a damages claim. See David Couch, Corporate Neglect in Nursing Homes, 44-SEP Trial 50, 53 (Sept. 2008); Yao O. Dinizulu & Jennifer Matta, The Multi-Level Nursing Home Corporate Structure: Transparency, Accountability and Common Sense, 15 No. 6 Andrews Health Care Fraud Litig. Rep. 3 (Dec. 10, 2009); Duhigg, At Many Homes; Mei Zhao & D. Rob Haley, Nursing Home Quality, Staffing, and Malpractice Paidr-Losses, 38 No. 1 J. Health Care Fin. (Aspen) 1, 7 (Fall 2011).
For plaintiffs in nursing home litigation, basic principles of personal jurisdiction limit their ability to obtain jurisdiction of nonresident, upstream owners of nursing homes and the nonresident officers and employees of such entities. “Ownership of a resident subsidiary corporation by an out-of-state parent corporation, without more, has been repeatedly deemed insufficient to meet the requirements of section 48.193.” Res. Healthcare of Am., Inc. v. McKinney, 940 So.2d 1139, 1143 (Fla. 2d DCA 2006) (citing Greystone Tribeca, 863 So.2d at 476). The same rule applies to nonresident individual shareholders of corporations resident in Florida. See Seabra v. Int’l Specialty Imps., Inc., 869 So.2d 732, 734 (Fla. 4th DCA 2004); Suroor v. First Inv. Corp., 700 So.2d 139, 141-42 (Fla. 5th DCA 1997); cf. Kitroser v. Hurt, 85 So.3d 1084, 1090 (Fla.2012) (“Where an individual, nonresident defendant commits negligent acts in Florida, whether on behalf of a corporate employer or not, the corporate shield doctrine does not operate as a bar to personal jurisdiction in Florida over the individual defendant”). Moreover, in accordance with the corporate shield doctrine, “acts of [a] corporate employee performed in [his] corporate capacity do not form the basis for jurisdiction over [the] corporate employee in his individual capacity.” Rensin v. State, Office of the Attorney General, 18 So.3d 572, 574 (Fla. 1st DCA 2009) (alterations in original) (quoting Doe v. Thompson, 620 So.2d 1004, 1006 (Fla.1993)). The corporate shield doctrine also applies to a nonresident who acts in a representative capacity on behalf of a limited liability company. Stomar, Inc. v. Lucky Seven Riverboat Co., L.L.C., 821 So.2d 1183,1187 (Fla. 4th DCA 2002). However, “a nonresident corporate officer is subject to personal jurisdiction if the officer directed ‘fraud or other intentional misconduct’ at parties in the State of Florida.” Rensin, 18 So.3d at 575 (citing Doe, 620 So.2d at 1006 n. 1).
*182 The plaintiff may establish personal jurisdiction of the upstream, nonresident parent in three ways. First, the plaintiff may show that “the non-Florida parent company independently satisfies the test for jurisdiction under Florida’s long-arm statutes.” Qualley v. Int’l Air Serv. Co., 595 So.2d 194, 196 (Fla. 3d DCA 1992) (citing MacMillan-Bloedel, Ltd. v. Canada, 391 So.2d 749, 750 (Fla. 5th DCA 1980)). Second, the plaintiff may establish facts that justify piercing the corporate veil. See Salley, 2010 WL 5136211, at *4; House, 60 F.Supp.2d at 608-13 (piercing the corporate veil of several upstream owners of a nursing home based on a strong factual showing by the plaintiff). See generally, Dinizulu & Matta, The Mul-ti-Level Nursing Home Corporate Structure (discussing piercing the corporate veil as a means of imposing liability on the nursing home’s lender, landowner, and management companies); John A. Pearce II, John J. O’Brien, & Derek A. Rapisarda, Protecting Nursing Home Residents from Attacks on Their Ability to Recover Damages, 61 Rutgers L. Rev. 705, 732 — 45 (Spring 2009) (discussing piercing the corporate veil in the context of nursing home litigation). Third, the plaintiff may show that the parent exercises sufficient control over the subsidiary to render the subsidiary an agent or alter ego of the parent, thus establishing jurisdiction.[4] Enic, PLC v. F.F. South & Co., 870 So.2d 888, 891 (Fla. 5th DCA 2004). However, “[t]he amount of control exercised by the parent must be high and very significant.” Id. (citing State v. Am. Tobacco Co., 707 So.2d 851, 855 (Fla. 4th DCA 1998)); see also Salley, 2010 WL 5136211, at *4-5 (holding that an upstream, nonresident parent did not exercise sufficient control of its nursing home subsidiary to establish an agency relationship sufficient to support personal jurisdiction); Extendicare, Inc. v. Estate of McGillen, 957 So.2d 58, 64 (Fla. 5th DCA 2007) (holding that the plaintiff failed to offer evidence that the upstream, nonresident parent of a nursing home controlled its subsidiaries to the extent that an agency relationship existed that would support long-arm jurisdiction).
In this case, Ms. Knobloch established only that the Appellants have indirect ownership interests in the nursing home’s operating and management companies. But nothing about the Appellants’ financial interests in the nursing home is related in any way to Ms. Knobloch’s claims. Ms. Knobloch has failed to establish any connexity between the Appellants’ financial interests in the nursing home and the alleged abuse from which her claims arise. See Camp Illahee Investors, 870 So.2d at 85 (“By its terms, section 48.193(1) requires connexity between the defendant’s activities and the cause of action.”). Ms. Knobloch has also failed to show that the Appellants have sufficient minimum contacts with Florida to establish personal jurisdiction over them here. Thus Ms. Knobloch did not prove a basis for long-arm jurisdiction over the Appellants under section 48.193(l)(a). In addition, because the Appellants’ only “activity” in Florida is their indirect ownership interests in the nursing home’s operating and management companies and because, as discussed below, they are not engaged in the day-to-day operations of the nursing home, we conclude that Ms. Knobloch did not establish that the Appellants are engaged in substantial and not isolated activity in Florida. Accordingly, Ms. Knobloch *183 did not prove a basis for long-arm jurisdiction against the Appellants under section 48.193(2).
Ms. Knobloch argues that she has demonstrated that the Appellants have sufficient control over the day-to-day operations of the nursing home sufficient to establish an agency relationship. We disagree. Ms. Fierro’s affidavit established nothing more than that the Appellants had significant ownership interests in the nursing home. As we have noted, such ownership, without more, is insufficient to establish personal jurisdiction over a nonresident defendant. Hilltopper Holding Corp. v. Estate of Cutchin, 955 So.2d 598, 603 (Fla. 2d DCA 2007); Extendicare, 957 So.2d at 64; see also Schwartzberg v. Estate of Simoneau, 77 So.3d 913, 914 (Fla. 1st DCA 2012) (reversing a circuit court’s order denying a motion to dismiss for lack of personal jurisdiction made by substantially the same defendants as in this case).
VII. CONCLUSION
The circuit court erred in finding that it had personal jurisdiction of the Appellants. Accordingly, we reverse the order under review and remand with directions to grant the Appellants’ motions to dismiss.
Reversed and remanded with directions.
CASANUEVA and LaROSE, JJ., Concur.

. We have jurisdiction under Florida Rule of Appellate Procedure 9.130(a)(3)(c)(i).

. The New York trusts also had an indirect ownership interest in New Surfside Administrators, LLC. We are unable to determine the role of New Surfside Administrators, LLC, from our record.

. The letter and the diagrams are the source for much of the discussion concerning the structure of the ownership and operation of die nursing home and its related companies in part II of this opinion.

. Several commentators have referred to this theory in the context of nursing home litigation as "direct participant liability.” Couch, supra, at 53; Dinizulu, The Multi-Level Nursing Home Corporate Structure; Michael J. Griffin, Defense of Corporate Parents: Managing Direct Participant Liability Claims, 52 No. 7 DRI For Def. 17 (July 2010).