[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-11996

_____

SHEILA KNEPFLE,

Plaintiff-Appellant-
Cross Appellee,

*versus*

J-TECH CORPORATION,
a foreign corporation,

Defendant,

J & P CYCLES, LLC,
a foreign corporation,
LEMANS CORPORATION,

2                    Opinion of the Court                    21-11996

a foreign corporation,

                                            Defendants-Appellees,


HJC CORP.,

                                            Defendant-Appellee-
                                            Cross Appellant.


_____

Appeals from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:18-cv-00543-KKM-CPT

_____

Before WILSON, BRANCH, and LAGOA, Circuit Judges.

BRANCH, Circuit Judge:

        Sheila Knepfle, a Florida citizen and resident, appeals from
the district court's grant of summary judgment in favor of a mixed
group of domestic and foreign corporations, (collectively, "the
defendants"), in a product liability action stemming from a
motorcycle accident and allegedly defective helmet.    Knepfle
contends that the district court erroneously excluded the testimony

of her expert witness, Dr. John D. Lloyd, after finding his testimony based on novel and untested theories unreliable.

In the district court proceedings, defendant HJC Corporation ("HJC"), a foreign corporation organized under the laws of, and principally operating within, South Korea, moved separately for summary judgment based on a lack of personal jurisdiction. The district court denied this motion as moot, after granting summary judgment to all the defendants on the merits. HJC cross-appeals from the denial of its motion and maintains that the district court lacked personal jurisdiction over it. According to HJC, the district court erroneously conflated HJC with its domestic subsidiary, HJC America, Inc. ("HJCA"), without conducting any veil-piercing analysis or alter-ego analysis. Consequently, the district court attributed HJCA's marketing efforts to HJC and found that the parent company had sufficient contacts with Florida to allow Knepfle to hale it into federal court from across the world.

After careful review, and with the benefit of oral argument, we conclude that the district court erred by failing to conduct a veil-piercing or alter-ego analysis with respect to HJC and HJCA for personal jurisdiction purposes. We agree with HJC that the district court erred by failing to address HJC's jurisdictional motion before reaching the merits of the defendants' summary judgment motion. Accordingly, we **REVERSE** the district court's denial of HJC's motion for summary judgment.

Moving to the merits, the district court properly excluded Knepfle's expert's testimony pursuant to Federal Rule of Evidence

702 and *Daubert v. Merrell Dow Pharmaceuticals, Co.*, 509 U.S. 579 (1993). To present his products liability theory, Dr. Lloyd needed to demonstrate that he employed a reliable methodology in determining that Knepfle was not wearing her helmet during her secondary impact with the pavement, and, additionally, that the straps holding the helmet in place could loosen during normal usage. Not only did Lloyd fail to follow what he conceded were generally accepted practices in his field—taking measurements that would confirm or disprove his theory that Knepfle's helmet flew off during her accident—he also failed to conduct a single study of the helmet's double-D ring fastening system under real-world conditions.

Because the district court properly excluded Lloyd's testimony, we **AFFIRM** the district court's grant of summary judgment in favor of the defendants.

## I.    BACKGROUND

On February 16, 2014, Knepfle, riding her Harley-Davidson motorcycle, approached an intersection in Spring Hill, Florida. As she pulled up, the driver of an oncoming Mazda turned left, and Knepfle hit the vehicle's side, vaulting her forward off of her bike. The Z1R Nomad Sinister half-shell helmet she was wearing protected her head as it impacted the Mazda's front passenger side. But according to Knepfle, before landing on the pavement, her helmet came off, and her unprotected skull hit the pavement, causing permanent injuries.

Knepfle filed a products-liability action in Florida state court alleging strict liability, negligence, and negligent performance against LeMans Corporation ("LeMans"), a Wisconsin corporation with its principal place of business in Wisconsin; J-Tech Corporation ("J-Tech"), a Korean corporation with its principal place of business in Korea; and J&P Cycles, LLC ("J&P"), a limited liability company whose sole member, Motorsport Aftermarket Group, Inc., is a Delaware corporation with its principal place of business in California.  LeMans timely removed the case to federal court.  In November 2018, Knepfle moved to file an amended complaint, explaining that she did not know whether J-Tech or a separate Korean corporation, HJC, manufactured her helmet, and the district court granted her motion.  Soon after, Knepfle filed her First Amended Complaint in the United States District Court for the Middle District of Florida, adding HJC as a defendant to the lawsuit.  According to Knepfle, the Z1R Nomad helmet "contained a manufacturing or design defect wherein the helmet would not stay securely on [her] head and would suddenly, and without warning, fly off of her head during ordinary and foreseeable use . . . ."  Consequently, she maintained that her helmet flew off in the time between her first and second impacts.

In May 2019, HJC moved to dismiss Knepfle's suit against it for lack of personal jurisdiction, explaining that, contrary to Knepfle's claims, HJC only conducted business overseas.  The district court denied the motion as well as HJC's motion for reconsideration of that order.  It found that Knepfle pled facts

sufficient to track the language of Florida's long arm statute, and—without distinguishing between HJC and its domestic subsidiary, HJC America, Inc. ("HJCA")—that personal jurisdiction over HJC comported with due process because, through HJCA's website, HJC "purposefully availed itself of Florida['s]" market.

Soon after, the defendants filed answers to Knepfle's complaint asserting multiple affirmative defenses, including a lack of personal jurisdiction over HJC. At that point, Knepfle voluntarily dismissed J-Tech, leaving HJC; J&P; Motorsport Aftermarket Group, Inc.; and LeMans as defendants, and proceeded to discovery.

Discovery revealed that Knepfle purchased the Z1R Nomad helmet from a J&P store in Ormond Beach, Florida, in October 2009. J&P, an Iowa corporation with a principal place of business in Texas, purchased the helmet from LeMans, a Wisconsin company that, in relevant part, sells Z1R Nomad brand motorcycle helmets as its private label brand. Although LeMans formulated and owns the Z1R Nomad model name, HJC served as LeMans's designer and manufacturer for the helmet.

HJC is a South Korean corporation that primarily does business in South Korea. It does not conduct business in Florida and produced documentation and affidavits asserting that it does not advertise its helmets in Florida or to Florida residents, much less market the Z1R brand. Rather, pursuant to its business practices, HJC sells all its helmets, whether private-label or HJC-branded, to wholesale distributors, none of which are in Florida.

HJC designed the Z1R Nomad helmet at issue in South Korea and manufactured it at a plant in Beijing, China. However, a foreign subsidiary of LeMans purchased and took possession of the helmet overseas.

Notably, though, HJC's domestic subsidiary, HJCA—principally located in La Habra, California—operates a website providing marketing and warranty information for HJC-branded helmets but not for those manufactured under private labels. Though HJCA does not sell HJC-branded helmets through its website, it provides information about where to purchase them, including at retailers in Florida. Nevertheless, HJCA has never advertised the private label Z1R Nomad helmet on its website.

After discovery, Knepfle and the defendants each sought to introduce expert testimony, and to exclude the testimony of the other's expert, respectively. Knepfle's expert, Dr. John D. Lloyd, sought to present his novel theory that the Z1R Nomad helmet's double D-ring fasteners—which rest on the side of the wearer's chin, rather than beneath it—make the helmet more prone to losing tension than other types of helmet fasteners. Commensurately, Lloyd planned to testify that he believed that the D-rings on Knepfle's Z1R Nomad helmet lost tension after her initial impact with the Mazda, allowing the helmet to fly off before she hit her head on the ground. In support, Lloyd intended to point to his visual inspection of the accident, during which he saw no visible damage to the rear of Knepfle's helmet, which, in his view,

indicated that it had not endured a secondary impact with the pavement.

To confirm that suspicion, Lloyd inspected Knepfle's Z1R Nomad helmet and attended the defendants' expert's inspection of it, too. Lloyd observed superficial impact marks on the rear of the helmet, but, without providing any scientific basis, opined that "[h]ad the helmet been on [Knepfle's] head at the time of impact the gouge marks [on the rear of the helmet] would have been more substantial." During the defendants' expert's inspection, Lloyd also noticed visible compression of the helmet's compression liner in the upper front right quadrant without a corresponding fracture of the helmet's outer shell—which Lloyd attributed to the initial impact with the Mazda—but did not see any visible compression in the rear EPS liner.

Lloyd performed slightly more work on his design defect theory. After measuring Knepfle's head to confirm that the Z1R Nomad helmet was the correct size, he asked her to put on the helmet without adjusting the retainer strap. After Knepfle complied, Lloyd noticed that the double D-rings rested against the left side of her chin "in a near vertical orientation," an observation he subsequently confirmed on a dummy head. In his view, this created a risk of loosening not present in a helmet that allows for fastening under the chin. Based on data from a U.S. Army 1988 anthropometric survey, Lloyd determined that the Z1R Nomad helmet's left strap was too short: the Army data suggested a

required length of between 132 and 138 millimeters, while the Z1R Nomad helmet's left strap measured only 102 millimeters.

Over a Zoom call with Knepfle's counsel, Lloyd demonstrated how the incorrect orientation of the retainer straps could cause the helmet to fly off. Holding a demonstration helmet upside down with the left side of the helmet on the opposite side of the D-rings and pulling the retention strap lightly, Lloyd showed how his theory could work. Next, following published testing methods, Lloyd used a pendulum apparatus to determine the effect of an impact at speeds from 13 to 35 mph on a dummy head wearing a Department of Transportation-certified helmet as well as one not wearing a helmet. Comparing the data, Lloyd came to the unremarkable conclusion that a high-speed collision would cause more damage to an unhelmeted head than a helmeted one. He did not look into whether other accidents have occurred because of double-D locking mechanisms or if other motorcycle helmets have similar designs to the Z1R Nomad helmet.

In their motion to exclude Lloyd's testimony, the defendants argued that his proffered testimony fell short of *Daubert* and Rule 702 because he failed to perform any acceptable testing to determine whether Knepfle's Z1R Nomad helmet was in place when she hit the ground. They further contended that Lloyd failed to identify a single generally accepted test, peer-reviewed article, or independent study that supported his opinion on the design defect or his theory of events. The defendants also alleged that Lloyd's opinion rested on flawed and unreliable methodology.

Specifically, they highlighted that, although Lloyd took measurements of Knepfle's Z1R Nomad helmet's front protective foam liner, he did not conduct any measurements on the rear liner, and instead merely "eyeballed it." Furthermore, the defendants noted that Lloyd failed to look into whether other similar accidents occurred with other types of D-ring fasteners. Finally, they castigated Lloyd's failure to test his design defect theory beyond a simple "demonstration," explaining that:

> For his demonstration, [Lloyd] suspended a helmet upside down (holding it by the retention straps) and manipulated the straps and D-rings to create an angle between the long and short straps. As the angle neared or reached perpendicular, the tension on the D-rings relaxed and allowed them to separate. Once separated, the webbing of the long strap could pull through the double D-rings.

According to the defendants, Lloyd's demonstration bore little relevance to Knepfle's claims because it is impossible for the straps of a tightened retention system to become perpendicular while the helmet is fastened on a rider's head. And, as a result, Lloyd's testimony would be little more than unreliable *ipse dixit*.

In response, Knepfle argued that Lloyd's testimony satisfied *Daubert*. First, she noted his qualifications: Lloyd served as a senior researcher in biomechanics at the Department of Veterans Affairs and as a director of the biomechanics laboratory and traumatic brain injury research laboratory. Moreover, she emphasized that Lloyd has presented on the biomechanics of head

and brain injuries at scientific conferences, his work has appeared in peer-reviewed journals, he regularly testifies on helmet design defects in products-liability cases, and he was a co-investigator on a National Institute of Health grant to develop a medical helmet designed to mitigate the risk of head and brain injuries.

As for Lloyd's methodology, Knepfle argued that Lloyd's testimony about the length of the Z1R Nomad helmet's left side strap was "based on the science of anthropometry, the science of measurements[,] and proportions of the human body." And, because the greater the angle between the straps and the rings, the greater the likelihood of the double D-rings loosening, Lloyd planned to testify that an under-chin strap system would allow the rings to remain parallel to the straps at all times and prevent the incorrect orientation that ostensibly caused Knepfle's Z1R Nomad helmet to fly off.

During the *Daubert* hearing, Lloyd performed his Z1R Nomad helmet demonstration for the district court. Again flipping the helmet upside down and demonstrating how the straps would feed when pulled in particular positions, Lloyd testified that the Z1R Nomad helmet strap is too short, constituting a design defect which, in turn, caused Knepfle's injuries. He also showed the court a video he had created to demonstrate the effects on a dummy head. However, the video featured a dummy wearing a motorcycle helmet with a retention system fastened underneath the chin. The district court subsequently asked him whether he performed the same test on a dummy with a fastening system like

the Z1R Nomad helmet's.  He admitted that he had not.  The district court also asked him whether he had performed tests to confirm his hypothesis about vertical straps, and Lloyd admitted that he had not.

The district court granted the defendants' motion to exclude Lloyd's testimony.  At the outset, the district court recognized that "[a]lthough Lloyd likely possesses the requisite qualifications to testify," it found his methodologies "unreliable," noting that his novel theory had never been independently tested or subjected to peer review and that Lloyd failed to identify an error rate for the methodology or to establish any general scientific acceptance of the method.  Rather, the district court noted that

> no one has ever conducted a study of [Lloyd's] hypothesized design defect with the double D-rings clasping mechanism—including Lloyd.  He simply theorizes that it is feasible that the rings would permit the straps to loosen when perpendicular to the straps. Yet, he offers no evidence (including physics calculations) for support.

In addition to their motions *in limine*, the defendants also filed a joint motion for summary judgment on the merits, pointing out that Knepfle's case could not survive without Dr. Lloyd's testimony to establish a genuine dispute of material fact on the existence of a defect or causation.  HJC also filed a separate motion for summary judgment for want of personal jurisdiction, arguing

that it undisputedly did not manufacture, sell, or otherwise direct the product to Florida.

In a short, one-page response, Knepfle asserted, without reasoning or citation, that:

1. Defendants' Motion for Summary Judgment is wholly without merit.
2. There is no basis to strike Dr. Lloyd's opinions under *Daubert*.
3. Plaintiff filed a brief in opposition to Defendants' Motion to Exclude Testimony and Opinions of Dr. Lloyd on March 2, 2021. Plaintiff adopts and incorporates that brief in opposition here, as the arguments are basically the same.
4. Because there is no basis to strike Dr. Lloyd's opinions, Defendant's [sic] Motion for Summary Judgment must be denied.

The district court noted that, by failing to present any argument as to why it should not grant summary judgment if it excluded Dr. Lloyd's testimony, Knepfle had waived any opposition to the motion for summary judgment. It also highlighted Knepfle's counsel's concession during the *Daubert* hearing that Knepfle's case turned entirely on Dr. Lloyd's testimony about the D-ring system. And, because the district court had excluded Lloyd's testimony as unreliable, the district court granted the defendants' motion for summary judgment on the merits.

Having already granted the defendants' joint motion for summary judgment on the merits, the district court denied HJC's motion for summary judgment based on a lack of personal jurisdiction as moot. Knepfle timely appealed, and HJC cross-appealed.

## II.    ANALYSIS

Cognizant of our Article III responsibility to assure ourselves of our jurisdiction before reaching the merits of a case, we start with HJC's personal jurisdiction claim. *See Frank v. Gaos*, --- U.S. ----, 139 S. Ct. 1041, 1046 (2019). We then address Knepfle's arguments concerning the exclusion of Dr. Lloyd's testimony.

### A.  Personal Jurisdiction

In its cross-appeal, HJC argues that the district court erred by denying its motion for summary judgment based on a lack of personal jurisdiction because it conflated HJC, the foreign manufacturer that exclusively conducts business overseas, with HJCA, a domestic subsidiary tasked with marketing HJC portfolio products, but not those manufactured under other firms' private labels, including the Z1R Nomad. Rather, according to HJC, because it did not purposely avail itself of the Florida market, neither Florida's long-arm statute nor the Due Process Clause permitted the district court to exercise personal jurisdiction over

it.[1]  HJC is correct and the district court committed jurisdictional error.

We review *de novo* whether a district court properly exercised personal jurisdiction over a nonresident defendant. *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013).

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014) (citing Fed. R. Civ. P. 4(k)(1)(A)). To that end, we turn to Florida's long-arm jurisdictional statute, Fla. Stat. § 48.193(1)(a), to determine whether the district court properly exercised jurisdiction over HJC. We conclude that it did not.

Pursuant to Florida's long-arm statute, a nonresident defendant submits to personal jurisdiction in Florida by:

> [c]ausing injury to persons or property within [Florida] arising out of an act or omission by the defendant outside [Florida], if, at or about the time of the injury . . . (b) [p]roducts, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within [Florida] in the ordinary course of commerce, trade, or use.

---

[1] Knepfle failed to file a brief in reply.

Fla. Stat. § 48.193(1)(a)(6)(b).  And, to determine whether personal jurisdiction exists under § 48.193(1), Florida courts must conduct a two-part inquiry, first asking whether the factual allegations bring the plaintiff's action within the ambit of the long-arm statute and, second, if the facts implicate § 48.193(1), whether those facts demonstrate sufficient "minimum contacts" to satisfy due process requirements.  *See, e.g.*, *Wendt v. Horowitz*, 822 So. 2d 1252, 1257 (Fla. 2002).  Simultaneously, the Fourteenth Amendment's Due Process Clause limits a state's power to exercise control over a nonresident defendant.  *Walden v. Fiore*, 571 U.S. 277, 283 (2014).

HJC maintains that the district court erred by concluding that Florida's long arm jurisdictional statute authorized it to hale the Korean corporation into court based on HJCA's marketing.  Further, it emphasizes that its interest in the Z1R Nomad helmet ended over 7,500 miles away from Florida, when it sold the product to a distributor in southeast Asia.  Indeed, nothing in the record establishes that HJC played any role, or took any interest, in the fate of the helmet after HJC sold it.  Despite recognizing this fact, the district court exercised jurisdiction after noting that HJC knows that retailers sell its helmets in 167 different retail locations in Florida, and that HJC actively sought the benefit of the Florida

market.[2]    Simply put, the district court attributed HJCA's marketing efforts to its foreign parent, HJC.[3]

Florida provides for the exercise of personal jurisdiction over a nonresident parent corporation based on the actions or omissions of its subsidiary entities as follows:

> plaintiff may establish personal jurisdiction of [an] upstream, nonresident parent in three ways. First, the plaintiff may show that the non-Florida parent company independently satisfies the test for jurisdiction under Florida's long-arm statutes. Second, the plaintiff may establish facts that justify piercing the corporate veil. Third, the plaintiff may show that the parent exercises sufficient control over the subsidiary to render the subsidiary an agent or alter ego of the parent, thus establishing jurisdiction.

---

[2] According to the district court, "HJC itself publishes a list of 167 retail locations where its products can be purchased throughout Florida. Not only does HJC specifically know its helmets will end up in Florida, but it actively seeks the benefit of the Florida market."

[3] We note that Knepfle purchased the Z1R Nomad helmet from LeMans, which sells the Z1R helmets as its private label brand. HJC manufactures both private-label helmet brands for other companies, as well as its own HJC-branded helmets, which are then sold to wholesale distributors. The distinction between the Z1R-branded helmets, or other private label brands, and the HJC-branded helmets does not affect our analysis because none of the distributors with whom HJC conducts business are in Florida. The fact remains that the district court improperly attributed, without addressing the applicable standard under Florida law espoused in *Schwartzberg*, the actions of HJCA to its nonresident parent corporation, HJC.

> However, [t]he amount of control exercised by the parent must be high and very significant.

*Schwartzberg v. Knobloch*, 98 So. 3d 173, 182 (Fla. 2d DCA 2012) (alteration in original) (internal citations, quotations, and footnote omitted).

In its due process analysis, the district court, citing exclusively to other district courts, explicitly attributed HJCA's domestic efforts to market HJC-branded helmets to HJC in order to find that Knepfle properly pled sufficient facts to establish HJC's knowledge that the Z1R Nomad helmet would be directed to Florida, a jurisdictional prerequisite under Florida's long-arm statute. *See Aegis Def. Servs., LLC v. Gilbert*, 222 So. 3d 656, 661 (Fla. 5th DCA 2017) (citing *Schwartzberg*, 98 So. 3d at 177). This attribution was, according to Florida's own interpretation of its law, erroneous because Knepfle failed to make the requisite showing to justify piercing the corporate veil or to demonstrate that HJCA was an alter ego of HJC.

Specific jurisdiction under § 48.193(1) "requires a connection or 'connexity' between the enumerated activity in Florida and the cause of action." *Gilbert*, 222 So. 3d at 661. In this case, the district court found "connexity" between the sale of the Z1R Nomad helmet and HJCA's efforts to cultivate the Florida market by publishing a list of retailers at which consumers could purchase HJC-branded helmets. But, in Florida, when a plaintiff seeks to assert specific personal jurisdiction against an out-of-state parent corporation using its subsidiary's efforts, she must either

"establish facts that justify piercing the corporate veil" or "show that the parent exercises sufficient control over the subsidiary to render the subsidiary an agent or alter ego of the parent, thus establishing jurisdiction."[4] *Schwartzberg*, 98 So.3d at 182.

Knepfle, in her response to HJC's motion to dismiss below, emphasized the number of retailers in Florida selling HJC's products. Citing to HJCA's website, she conflated HJCA with its nonresident parent company and did not attempt to explain why HJCA's marketing efforts in Florida were sufficient to render it an alter ego of HJC. Knepfle even acknowledged that HJCA "promotes" HJC's products in Florida but contended without elaboration that "[i]t would be completely outrageous for HJC to assert that it had no knowledge that its goods would be sold in Florida[.]"[5] However, without more, Knepfle has not demonstrated that HJCA's actions can be attributed to HJC for the

---

[4] A court may exercise personal jurisdiction over a defendant based on general or specific personal jurisdiction. General personal jurisdiction applies to a corporation like HJC "when the corporation's affiliations with the State in which suit is brought are so constant and pervasive as to render [it] essentially at home in the forum State." *Daimler AG*, 571 U.S. at 122 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). Because Knepfle does not claim that HJC submits to general personal jurisdiction in Florida, we concern ourselves only with the district court's specific personal jurisdiction over it.

[5] Knepfle seemed to shy away from acknowledging the separateness of HJC's and HJCA's corporate structures, referring to HJCA as HJC's "North American branch," rather than as a subsidiary.

20                    Opinion of the Court                    21-11996

purpose of exercising personal jurisdiction under Florida's long-arm statute.  She failed to establish facts that justify piercing the corporate veil or to show that HJC exercises sufficient control to render HJCA its alter ego.  Accordingly, under Florida law, HJCA's actions cannot establish the contacts necessary to hale HJC into court under Florida's long-arm statute.  We therefore conclude that the district court lacked specific personal jurisdiction over HJC and erred in denying HJC's motion for summary judgment.

B.  Evidentiary Challenges

Turning to the merits on appeal, Knepfle contends that the district court abused its discretion by granting the defendants' joint motion to exclude Dr. Lloyd's testimony, and, subsequently, erred by granting their motion for summary judgment on her products-liability claims.[6]  While the district court, after a two-day *Daubert* hearing, concluded that Dr. Lloyd qualified as an expert and that his testimony could help the jury resolve complex scientific issues, it also found Dr. Lloyd's testimony inadmissible because it relied on unreliable methodology.  After examining the record, we find that the district court did not abuse its discretion in excluding Dr. Lloyd's testimony as unreliable.

---

[6] Knepfle's argument is best characterized by her counsel's statement at oral argument: "Dr. Lloyd used a whole lot of science," which the district court ignored during its Rule 702 analysis.  In reality, however, the district court listened to, and properly rejected, Dr. Lloyd's "science."

21-11996                Opinion of the Court                21

We review a district court's exclusion of expert testimony for abuse of discretion. *Seamon v. Remington Arms Co., LLC*, 813 F.3d 983, 987 (11th Cir. 2016). "The considerable leeway accorded to a district judge requires us to defer to the judge's decision on expert testimony, unless it is manifestly erroneous." *Chapman v. Proctor & Gamble Distrib., LLC*, 766 F.3d 1296, 1305 (11th Cir. 2014) (internal citations and quotation omitted).

In federal trials, district courts must act as "gatekeep[ers]" to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589 & n.7. Rule 702, which governs the admission of expert testimony, permits a district court to admit expert opinion testimony if:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Hence, pursuant to Rule 702, a district court should determine the admissibility of expert testimony by considering these three factors:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the

methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (footnote omitted).

With respect to the first factor, an expert's scientific training, education, or field experience may qualify him to testify on certain matters. *See United States v. Frazier*, 387 F.3d 1244, 1260–61 (11th Cir. 2004).

However, reliability, the second factor, requires a more thorough inquiry. To assess the reliability of an expert's testimony, courts consider: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Id.* at 1262 (quotation omitted); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (explaining that reliability requires a case-specific inquiry). Although we commit decisions regarding an expert's reliability to the district court's sound discretion, it may not "make ultimate conclusions as to the persuasiveness of the proffered evidence." *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) (quotation omitted).

Finally, turning to the third factor, helpfulness, expert testimony generally helps the trier of fact when the testimony "concerns matters that are beyond the understanding of the average lay person." *Frazier*, 387 F.3d at 1262. "But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Rather, a "court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.*; *see also McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004) ("Under *Daubert*, scientific testimony does not assist the trier of fact unless the testimony has a justified scientific relationship to the pertinent facts.").

Nevertheless, even the admission of expert testimony that satisfies *Daubert* lies at the sound discretion of the district court. *Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1331 (11th Cir. 2014). Finally, the party seeking to introduce the expert at trial bears the burden of establishing his qualifications, reliability, and helpfulness. *Frazier*, 387 F.3d at 1260.

Knepfle predicated her products liability claim—and, accordingly, her appeal—on two distinct but coterminous theories. First, she argued that she had her helmet on for the first impact— when the front of her head hit the car—but not the subsequent one—when the back of her head collided with the pavement. Second, Knepfle claimed that a design defect, the Z1R Nomad's double-D fastening system, allowed the helmet to come loose

while she was mid-air—which would not occur if the helmet fastened underneath the wearer's chin. Because the district court excluded Dr. Lloyd's testimony with respect to both theories, and Knepfle appeals the exclusion of both parts of his testimony, we address each in turn.

i.    *Reliability of an "eyeballing" inspection for helmet liner compression*

Starting with Dr. Lloyd's testimony about helmet liner compression, or lack thereof, the district court found Dr. Lloyd's methodology unreliable. Contrary to Knepfle's assertion that visual inspections are generally acceptable means of testing liner compression, the district court pointed to Lloyd's own testimony that the industry standard requires practitioners to use calipers or 3D scanning technology, and that a compression to the liner could exist that cannot be seen by the naked eye. On appeal, Knepfle contends that the district court misinterpreted Lloyd's testimony: rather than saying that his colleagues would find mere visual inspections unscientific, she maintains that Lloyd said that experts in the field reserve measurement for compression visible to the naked eye. And, in Knepfle's view, Lloyd's methodology was reliable because it focused on "*relevant* compression (*i.e.,* clearly visible compression)."[7] We disagree.

---

[7] Knepfle does not offer any explanation as to why only visible compression would be relevant. She merely states that the district court glossed over the "vital" distinction in Lloyd's methodology between visible compression and

We start by dispensing with Knepfle's claim that the district court misconstrued Dr. Lloyd's testimony about the general acceptance of his "eyeballing" method. Despite her contentions on appeal, our review of the record confirms the district court's interpretation. During the *Daubert* hearing, the district court asked Lloyd how "other scientists or experts" measure liner compression, and whether "they do a visual inspection alone, [or if it is] standard practice to measure." Lloyd responded that other experts use "[c]alipers typically. [And that] [m]ore recently, the [3D] scanning has come into play."

However, despite Lloyd's acknowledgment that experts in the field "typically" use calipers and, sometimes, 3D scanning to measure liner compression (rather than visual inspection alone), Knepfle asks the fact-finder to take Lloyd at his word that "eyeballing" the rear compression liner is a generally accepted method of determining force of impact without additional measuring. Knepfle argues that the district court's "failure to recognize" the thrust of Lloyd's testimony—that he did not need to proceed past a visual inspection—amounts to abuse of discretion. However, Knepfle has put forth no evidence that visual inspection alone is a generally accepted methodology. The district

_____

compression "not visible to the naked eye." Rather, Knepfle quotes Lloyd's hearing testimony in which he claimed that there was "no evidence of impact to the rear" of the helmet, pointing only to eyewitness testimony, rather than any sort of inspection, measurement, or evaluation of the helmet he conducted.

court did not abuse its discretion in declining to take Lloyd at his word.

Not only do *Daubert* and its progeny not require the district court to admit expert opinions based on the *ipse dixit* of the expert, Lloyd applied his methodology inconsistently. Lloyd followed the generally accepted methodology to assess the size of the liner compression in the front portion of Knepfle's helmet but chose not to follow the same methodology for the rear of Knepfle's helmet. Thus, on one hand, Lloyd implicitly conceded needing to collect measurements to verify that the only conspicuous liner compression in the front came from a high-force impact but not to determine whether there was any non-conspicuous compression stemming from relatively weaker, but still significant, secondary impacts.[8] Indeed, rather than taking measurements to *exclude* alternative theories, Lloyd's methodology seems to focus only on obtaining evidence that *confirms* a predetermined theory.

Instead of providing any evidence that other experts accept visual inspections or showing that her second impact would necessarily result in visible liner compression, Knepfle's entire claim distills to the contentions that Lloyd is an expert, he looked at the available evidence, and deduced what happened. Quite simply, Knepfle relies on Lloyd's unreliable *ipse dixit*. But "nothing in either *Daubert* or the Federal Rules of Evidence requires a

---

[8] Importantly, Lloyd testified that it would be possible for compression of the liner not to be visible to the naked eye.

district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 552 U.S. at 146.

Consequently, the district court did not abuse its discretion by finding that Dr. Lloyd's methodology concerning the helmet liner compression was unreliable.

### ii.     *Design Defect Theories*

With respect to the district court's exclusion of Lloyd's design defect testimony, we disagree with Knepfle that the district court abused its discretion. As with Lloyd's "eyeballing" test for liner compression, the district court found that Knepfle failed to provide any evidence that his methodology concerning helmet strap failure—which involved flipping an empty helmet upside down and manipulating the straps—is generally accepted, let alone reliable. Yet on appeal Knepfle contends that the district court erred in its application of *Daubert* because defendants' expert could not point to any peer-reviewed studies that *disprove* Lloyd's theory about helmet straps.

Knepfle misunderstands her burden of proof under *Daubert*. She bears the burden of proving that Lloyd's opinions are reliable, and the district court properly identified this burden. *See Frazier*, 387 F.3d at 1260. It is not the job of defendants' expert, or of the district court for that matter, to prove her expert wrong. Accordingly, on abuse of discretion review of *Daubert* rulings, we must "defer to the judge's decision on expert testimony, unless it is

manifestly erroneous." *Chapman*, 776 F.3d at 1305 (quotation omitted). We focus our inquiry not on whether Lloyd's theories were correct, but only on whether the district court properly evaluated Lloyd's testimony for reliability under the Federal Rules of Evidence and *Daubert*. We conclude that it did.

Again, Lloyd presented no evidence establishing the general acceptance of flipping an empty helmet upside down and manually manipulating the straps to establish the performance of that helmet under real-world conditions. The district court properly concluded that Lloyd needed to show that his methodology could stand on its own, and Knepfle fails to show that the district court's decision was manifestly erroneous. Granted, Lloyd reliably demonstrated that helmet straps, free of any friction or resistance that a person's head would normally provide, may reach certain angles that render the Z1R Nomad's double D-ring system deficient. But he failed to show that the conditions necessary for the locking mechanism to fail can occur in real-world situations, saying nothing of Knepfle's specific case.

Because Knepfle could not show that the district court's decision was manifestly erroneous, we hold that it did not abuse its discretion in excluding Dr. Lloyd's testimony.

C. Summary Judgment

Finally, we briefly address Knepfle's claim that the district court erred by granting summary judgment in favor of the remaining defendants. After excluding Dr. Lloyd's testimony, the

district court determined that Knepfle failed to identify any material disputes of fact regarding the existence of a design defect in the Z1R Nomad helmet or the defendants' role in causing her injuries under her strict liability, negligence, and negligent failure to warn claims.[9] As a result, it granted the defendants' motion for summary judgment. We affirm.

We review *de novo* a district court's grant of summary judgment. *Amy v. Carnival Corp.*, 961 F.3d 1303, 1308 (11th Cir. 2020). A district court should grant summary judgment when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Hughes*, 766 F.3d at 1331. The party seeking summary judgment may accomplish this by establishing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

To assert a claim under Florida law for a product defect, "whether the claim is for negligence or strict liability, a plaintiff must show '(1) that a defect was present in the product; (2) that it caused the injuries complained of; and (3) that it existed at the time the retailer or supplier parted possession with the product.'" *Lesnik v. Duval Ford, LLC*, 185 So. 3d 577, 581 (Fla. 1st DCA 2016)

---

[9] We need not address Knepfle's general negligence claims against the remaining defendants because they all rely on, and fail for the lack of, the existence of a design defect.

(quoting *Cassisi v. Maytag Co.*, 396 So. 2d 1140, 1143 (Fla. 1st DCA 1981)).

Without Dr. Lloyd's testimony, nothing in the record supports Knepfle's claim that the Z1R Nomad helmet was defectively designed or manufactured. Knepfle also set forth no argument below as to why the district court should not grant defendants' motion for summary judgment. Accordingly, the district court properly granted the defendant's motion for summary judgment on Knepfle's strict liability and negligence claims. *See Celotex*, 477 U.S. at 325.

## III. CONCLUSION

Because the district court improperly exercised personal jurisdiction over HJC, we reverse its denial of HJC's motion for summary judgment.

We affirm the district court's grant of the defendants' motion to exclude Knepfle's expert's testimony because she fails to demonstrate that the district court's decision was manifestly erroneous. Because the district court properly excluded Knepfle's expert's testimony, we affirm the district court's grant of summary judgment in favor of the defendants.

**REVERSED IN PART AND AFFIRMED IN PART.**